1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7
JAMES GUNN and DUSTIN STAFFORD, *on behalf of themselves and all others similarly situated*,

Case No. 3:22-cv-02229-JD

8

9
Plaintiffs,

**ORDER RE MOTION TO DISMISS**

10
v.

11
FCA US, LLC,

12
Defendant.

United States District Court
Northern District of California

13          Plaintiffs James Gunn and Dustin Stafford have sued defendant-manufacturer FCA US,

14    LLC (FCA) on behalf of themselves and a putative California class of other purchasers of new

15    cars distributed for sale by FCA.  Dkt. No. 1.  The operative class action complaint alleges that

16    FCA artificially inflates the destination charges it assesses for transporting its new cars -- namely,

17    its Chrysler, Jeep, Dodge, Ram, Fiat, and Maserati brands, model years 2018 and later (the "Class

18    Vehicles") -- to dealerships, and that those inflated charges are passed on to consumers in

19    violation of state law.  Plaintiffs allege claims for violations of California's Unfair Competition

20    Law (UCL), Cal. Bus. & Prof. Code § 17200 *et seq.*, and Consumers Legal Remedies Act

21    (CLRA), Cal. Civ. Code § 1750 *et seq.*, as well as unjust enrichment and a common count for

22    money had and received.  *See* Dkt. No. 1 ¶¶ 76-110.

23          FCA asks to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), on the

24    ground that the destination charges are fully disclosed to consumers prior to purchase.  Dkt. No.

25    64. Plaintiffs filed an opposition.  Dkt. No. 67.  The complaint is dismissed with leave to amend.

26                                                      **BACKGROUND**

27          FCA, formerly known as the Chrysler Corporation, manufactures and distributes the Class

28    Vehicles for sale through its authorized dealers, which are located in every state.  *See* Dkt. No. 1

United States District Court
Northern District of California

1    ¶¶ 24, 37.  Plaintiffs Gunn and Stafford each purchased new Ram-branded cars from authorized

2    Dodge dealers in California.  *See id.* ¶¶ 11, 17.

3           For present purposes, Stafford's car-buying experience is illustrative.  Stafford paid a

4    dealer, Lodi Chrysler Dodge Ram, a total purchase price of $72,220 for a 2022 Ram 2500 Laramie

5    truck.  *See id.* ¶ 17.  When Stafford made his purchase, he "viewed the Monroney Label affixed to

6    the window."  *Id.* ¶ 18.  A Monroney label is the familiar sticker typically placed on a new

7    vehicle's door window that discloses "the manufacturer's suggested retail price [MSRP] and other

8    consumer information," 49 C.F.R. § 575.401(c)(4), as specified in the Automobile Information

9    Disclosure Act (AIDA), 15 U.S.C. § 1231 *et seq.*  The sticker is named after Senator Mike

10   Monroney of Oklahoma, who sponsored the AIDA to address deceptive practices in auto sales.

11   Under current law, a Monroney sticker must disclose:  "(1) the retail price of [the] automobile

12   suggested by the manufacturer; (2) the retail delivered price suggested by the manufacturer for

13   each accessory or item of optional equipment, physically attached to [the] automobile at the time

14   of its delivery to [the] dealer, which is not included within the price of [the] automobile as stated

15   pursuant to paragraph (1); (3) the amount charged, if any, to [the] dealer for the transportation of

16   [the] automobile to the location at which it is delivered to [the] dealer; and (4) the total of the

17   amounts specified pursuant to paragraphs (1), (2), and (3)."  15 U.S.C. § 1232(f).

18          Stafford retained his Monroney label, which is reproduced below:

19

20

21



22

23

24

25

26

27

28

2

1   Dkt. No. 1 ¶ 18.  As shown, the sticker discloses (1) a base MSRP of $56,990, (2) optional

2   equipment priced at $13,435, (3) a destination charge of $1,795, and (4) a total price of $72,220.

3   *See id.* ¶¶ 18-19.

4          Plaintiffs say that FCA has revived a troubling practice, which contributed to the adoption

5   of the AIDA in 1958, whereby car manufacturers would charge dealers (and by extension,

6   consumers) "phantom freight."  *See id.* ¶¶ 27, 31-37.  FCA is said to impose "destination charges

7   for Class Vehicles [that] are substantially higher than the true cost of delivering the vehicles to

8   dealerships for sale."  *Id.* ¶ 49.  "Rather than charging the true cost of delivery, FCA inflates the

9   charges to generate additional profit for itself through a mechanism that consumers do not

10  understand, and which consumers cannot reasonably protect themselves against (since the charges

11  are misleadingly labeled on Monroney Stickers and are not subject to negotiation as is the base

12  sales price)."  *Id.*  FCA's ability to derive a profit through its destination charges is said to enable

13  it to artificially lower its MSRP and "mislead[] the public into underappreciating the cost of Class

14  Vehicles."  *Id.*  FCA does not dispute that it receives a profit from its destination charges.  *See*

15  Dkt. No. 64 at 2-4.

16                                    **LEGAL STANDARDS**

17         The standards governing a Rule 12(b)(6) motion to dismiss are straightforward.  *See*

18  *McLellan v. Fitbit, Inc.*, No. 16-cv-00036-JD, 2018 WL 2688781, at *1 (N.D. Cal. June 5, 2018);

19  *Swartz v. Coca-Cola Co.*, No. 21-cv-04643-JD, 2023 WL 4828680, at *1 (N.D. Cal. July 27,

20  2023).  Rule 8(a)(2) requires that a complaint make "a short and plain statement of the claim

21  showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To meet that rule and

22  survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege "enough facts to state a claim to

23  relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A

24  claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

25  the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*,

26  556 U.S. 662, 678 (2009).  Determining whether a complaint states a plausible claim for relief is a

27  "context-specific task that requires the reviewing court to draw on its judicial experience and

28  common sense."  *Id.* at 679.

United States District Court
Northern District of California

3

1    Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud

2    or mistake." Fed. R. Civ. P. 9(b). "This heightened pleading standard applies to claims that sound

3    in fraud, even if not formally denominated as such." *Freedline v. O Organics LLC*, 445 F. Supp.

4    3d 85, 89-90 (N.D. Cal. 2020) (citing *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir.

5    2009); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003)).

6    The touchstone of Rule 9(b) is notice. *See Williams v. J.P. Morgan Chase Bank, N.A.*, No.

7    22-cv-07149-JD, 2023 WL 3590682, at *1 (N.D. Cal. May 22, 2023). "A pleading is sufficient

8    under rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare

9    an adequate answer from the allegations." *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531,

10   540 (9th Cir. 1989). A "pleading must identify the who, what, when, where, and how of the

11   misconduct charged, as well as what is false or misleading about the purportedly fraudulent

12   statement, and why it is false." *United States ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 677

13   (9th Cir. 2018) (internal quotations and citation omitted); *see also In re Wells Fargo Forbearance*

14   *Litig.*, No. 20-cv-06009-JD, 2023 WL 3237501, at *1 (N.D. Cal. May 2, 2023).

15                                                    **DISCUSSION**

16   **I.       UCL CLAIM**

17   "California's UCL prohibits any 'unlawful, unfair, or fraudulent business act or practice.'"

18   *Rosell v. Wells Fargo Bank, N.A.*, No. 12-cv-06321-JD, 2014 WL 4063050, at *5 (N.D. Cal. Aug.

19   15, 2014) (quoting Cal. Bus. & Prof. Code § 17200); *see also Williams*, 2023 WL 3590682, at *3.

20   Plaintiffs base their claim on the UCL's "unfair" and "fraudulent" prongs. *See* Dkt. No. 1 ¶ 86

21   ("FCA's acts and practices relating to destination charges, as alleged in this complaint, constitute

22   unfair and fraudulent business practices, in violation of the UCL.").

23   **A.       "Unfair" Prong**

24   "The UCL does not define the term 'unfair.' In fact, the proper definition of 'unfair'

25   conduct against consumers is currently in flux among California courts." *Hodsdon v. Mars, Inc.*,

26   891 F.3d 857, 866 (9th Cir. 2018) (internal quotations and citation omitted). "Under the UCL's

27   unfairness prong, courts consider either: (1) whether the challenged conduct is tethered to any

28   underlying constitutional, statutory or regulatory provision, or that it threatens an incipient

United States District Court
Northern District of California

1    violation of an antitrust law, or violates the policy or spirit of an antitrust law; (2) whether the

2    practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers;

3    or (3) whether the practice's impact on the victim outweighs the reasons, justifications and

4    motives of the alleged wrongdoer." *Doe v. CVS Pharm, Inc.*, 982 F.3d 1204, 1214-15 (9th Cir.

5    2020) (internal quotations and citations omitted).

6    　　　　Plaintiffs say that FCA's conduct qualifies as "unfair" within the meaning of the UCL

7    because it violates established public policy and causes harm to the consumer that outweighs its

8    utility. *See* Dkt. No. 67 at 3-4; *see also* Dkt. No. 1 ¶ 87.  They clarified in an opposition brief that,

9    while the "fraud-based claims hinge on the deceptive aspects of FCA's practice -- labeling the

10   surcharge a 'destination' charge but not disclosing the mark-up of the charge to include profit --

11   [their] unfair-prong claim challenges only the mark-up itself."  Dkt. No. 67 at 6 (citing Dkt. No. 1

12   ¶¶ 87-88).  Put more directly, plaintiffs state that the "unfair claim is not premised on a

13   misrepresentation, non-disclosure, or other act of deception."  *Id.*  Plaintiffs make this concession

14   in an attempt to distinguish their UCL claim from the one dismissed in a materially identical case,

15   *Romoff v. General Motors LLC*, 574 F. Supp. 3d 782 (S.D. Cal. 2021), *aff'd*, No. 22-55170, 2023

16   WL 1097258 (9th Cir. Jan. 30, 2023) (unpublished).

17   　　　　On the public policy side, plaintiffs say that FCA's conduct in marking up its destination

18   charges undermines two policy objectives that are embodied in the AIDA and its legislative

19   history:  (1) promoting integrity in car marketing and sales, and (2) restoring price competition

20   among automakers.  *See* Dkt. No. 67 at 4.  With respect to marketing integrity, plaintiffs complain

21   that "FCA's inflated freight charges mean that consumers are not presented with the 'delivered

22   price . . . in a plain honest-to-goodness figure.'"  *Id.* (quoting Dkt. No. 1 ¶ 35).  As for price

23   competition, plaintiffs say that "[b]y artificially inflating its delivery surcharge to generate profit,

24   rather than raising its MSRP to do so, FCA avoids fair competition and thwarts consumers' ability

25   to comparison-shop."  *Id.* at 4-5.

26   　　　　Plaintiffs' acknowledgement that their UCL "unfair" claim challenges only the fact of the

27   destination charge mark-up, and not any deception, misrepresentation, or non-disclosure, is

28   enough to decline their policy-based argument.  The mark-up itself does not threaten the integrity

5

United States District Court
Northern District of California

1   of car sales or price competition among automakers.  If deception and non-disclosure are removed

2   from the calculus, as plaintiffs themselves urge, then the only plausible conclusion is that FCA

3   does in fact disclose the "plain honest-to-goodness figure" for its destination charges.  FCA's

4   charges may be higher than competitors' prices, but that fully disclosed fact does not thwart

5   consumers' ability to comparison shop.

6          Plaintiffs also have not plausibly alleged that FCA's conduct runs afoul of any public

7   policy that is embodied in the AIDA.  Plaintiffs rely mainly on the statements of individual

8   legislators.  *See, e.g.*, Dkt. No. 1 ¶¶ 30, 33-36; Dkt. No. 67 at 4.  This is a very slender evidentiary

9   reed.  Attempting to divine an actionable public policy in the remarks of a handful of legislators is

10  a questionable endeavor.  *See People v. Wade*, 63 Cal. 4th 137, 143 (2016) ("The statements of an

11  individual legislator, including the author of a bill, are generally not considered in construing a

12  statute, as the court's task is to ascertain the intent of the Legislature as a whole in adopting a

13  piece of legislation.") (cleaned up).  Plaintiffs try to make much of comments by Senator

14  Monroney during committee hearings (among other sources), but subsequent developments in the

15  legislative history call into question whether the AIDA itself provides an anti-"phantom freight"

16  public policy, as the complaint contemplates.  *See* Dkt. No. 1 ¶ 87.  Consider the following excerpt

17  from the Senate Report about the purpose of the statute:

18
19   Probably the most important feature of S. 3500 is that it would in no way infringe
     upon the freedom of the manufacturer to price his product; that it in no way would
     infringe upon the car purchaser's freedom to bargain over the price of the car, while
20   at the same time the dealer would be free to sell the new car for any price he desired,
     or pay anything he wanted to for the trade-in allowance.  The label would simply
21   assure that the purchaser would start the negotiations with the minimum necessary
     information.
22

23  S. Rep. No. 85-1555, at 2 (1958).  Just a few pages later, the Senate Report makes clear that the

24  legislation would not restrict manufacturers' ability to set the price for any component of the

25  transaction:

26
     It is not the purpose of S. 3500 to restrict the freedom of the manufacturer to establish
27   and announce a suggested retail delivered price for the automobile, its optional
     equipment, and any services to be performed by the dealer in acquiring and making
28   ready the vehicle for sale to the purchaser.

1    *Id.* at 10-11.

2         The Senate Report's emphasis that manufacturers would retain pricing freedom under the

3    AIDA is consistent with the legislation's plain purpose of furnishing consumers with basic

4    information to help them navigate a major purchasing decision.  If Congress wanted to eliminate

5    phantom freight or require the disclosure of actual freight costs, it could readily have done so.

6    Plaintiffs have not adequately alleged that FCA's conduct violates public policy embodied in the

7    AIDA.

8         That leaves plaintiffs' claim that FCA's conduct qualifies as "unfair" within the meaning

9    of the UCL because its harm outweighs its utility.  This inquiry is otherwise known as the

10   "balancing test."  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir. 2023) ("[T]o

11   support a finding of unfairness to *consumers*, a court uses the balancing test, which weighs the

12   utility of the defendant's conduct against the gravity of the harm to the alleged victim.") (cleaned

13   up).  To call this a "test" is generous.  It has been aptly characterized as "too amorphous" and

14   "provid[ing] too little guidance to courts and businesses."  *Cel-Tech Commc'ns, Inc. v. L.A.*

15   *Cellular Tel. Co.*, 20 Cal. 4th 163, 185 (1999).  Its application in a consumer case such as this one

16   is not without some doubt.  *See Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1169-70 (9th Cir.

17   2012) ("*Cel-Tech* held that the balancing test was too amorphous and provided too little guidance

18   to courts and businesses. . . .  Following *Cel-Tech*, appellate court opinions have been divided over

19   whether the definition of 'unfair' under the UCL as stated in *Cel-Tech* should apply to UCL

20   actions brought by consumers.") (cleaned up).

21        Setting aside any deception or misrepresentation as the basis for the claim,[1] plaintiffs' sole

22   complaint under the "unfair" prong's balancing test is that they "paid substantially more than they

23   otherwise would have" because of FCA's practices.  Dkt. No. 67 at 7.  But plaintiffs received full

24   disclosure of the destination charge.  They had no obligation to buy $97,000 and $72,000 trucks

25

26   _____

27   [1] Plaintiffs say that "[m]arking up a delivery charge provides no societal benefit; just hidden profit for FCA."  Dkt. No. 67 at 4.  Plaintiffs cannot be heard to complain that FCA's practices are unfair because they generate a "hidden" profit, having disclaimed reliance on any deception,

28   misrepresentation, or non-disclosure for purposes of their UCL "unfair" claim.  *See* Dkt. No. 67 at 6-7.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    that were manufactured by FCA.  In essence, plaintiffs ask the Court to determine how much of a

2    profit is fair or reasonable for FCA to make on the different components of its car sales.  As

3    amorphous as any balancing test warranted by the UCL might be, it does not authorize such broad

4    and limitless judicial intervention into private business affairs and transactions.  *See Searle v.*

5    *Wyndham Int'l, Inc.*, 102 Cal. App. 4th 1327, 1334 (2002) ("[T]he 'unfairness' prong of [the

6    UCL] does not give the courts a general license to review the fairness of contracts.") (internal

7    quotations and citation omitted).

8            **B.      "Fraudulent" Prong**

9            The fraudulent prong of plaintiffs' UCL claim is "governed by the 'reasonable consumer'

10   test."  *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008).  "That standard requires

11   that [plaintiffs] show that members of the public are likely to deceived."  *McGinity v. Procter &*

12   *Gamble Co.*, 69 F.4th 1093, 1097 (9th Cir. 2023) (internal quotations and citation omitted).

13   Plaintiffs allege that "FCA misrepresents its phantom freight charges as 'destination charges' and

14   fails to disclose that the surcharges are not reflective of the actual cost of delivery and instead

15   include additional amounts that FCA adds in to generate additional and hidden profit."  Dkt. No. 1

16   ¶ 88.

17           Another district court dismissed consumer-deception claims that are materially

18   indistinguishable from those presented here, concluding "that a reasonable or average consumer

19   would not expect the Destination Charge to exclude profit":

20           Plaintiffs allege that by calling the charge a "Destination Charge,"
21   [defendant-manufacturer] GM affirmatively "misleads reasonable consumers into
     believing its 'Destination Charge' reflects the actual cost of shipping its vehicles to
22   their 'destination,' not the cost of shipping its vehicles *plus* profit." . . .

23           . . .

24           The word "charge -- as used in the Complaint -- is defined as "the price
     demanded for something."  Reasonable or average consumers would not be surprised
25   to learn that the price of goods often includes profit for the seller.  The term
     "Destination Charge" does not reasonably imply an absence of profit.  *See Becerra*
26   *v. Dr Pepper/Seven Up, Inc.*, 945 F.3d 1225, 1230 (9th Cir. 2019) (rejecting an
     argument that a term in a label was misleading "[j]ust because some consumers may
27   unreasonably interpret the term differently").
28

1
2
3
4
5
6
7
8

United States District Court
Northern District of California

As alleged in the Complaint, the amount and existence of the Destination Charge and the total listed sticker price of GM's vehicles were fully disclosed. Plaintiffs received the vehicles they were promised at the prices they agreed upon. GM's alleged disclosure of the Destination Charge complied with the AIDA requirement that manufacturers divulge "the amount charged, if any, to such dealer for the transportation of such automobile to the location at which it is delivered to such dealer." 15 U.S.C. § 1232(f)(3). The statutory language contained in the AIDA -- requiring disclosure of "the amount charged" to the dealer -- no more suggests the absence of profit than the term "Destination Charge" itself. In summary, the allegations concerning the context of the vehicles' sales do not alter the common-sense understanding that a charge can include profit. . . . [T]he Complaint fails to allege facts to support an inference that Defendant made any affirmative misrepresentation.

9   *Romoff*, 574 F. Supp. 3d at 787-89 (some citations omitted). The *Romoff* court also rejected the

10  plaintiffs' omission theory of liability -- "that GM had a duty to disclose the existence of profit in

11  the Destination Charge and failed to do so" -- on the ground that "additional disclosure of the fact

12  that the charge includes profit would not affect a reasonable or average consumer's understanding

13  of the composition of the Destination Charge," and "GM's omission of additional information

14  regarding the Destination Charge is not material." *Id.* at 789.

15  The discussion in *Romoff* is persuasive with respect to the UCL's fraud prong, and our

16  circuit has so indicated in an affirmance in an unpublished disposition. Overall, a reasonable

17  consumer would not be misled by FCA's fully disclosed destination charge.

18  Plaintiffs try to distinguish *Romoff* on the ground that the complaint in that case "never

19  mentions (i) the concept of phantom freight, (ii) that Congress spent years eliminating it, (iii) that

20  the automakers made a commitment to Congress to stop marking up their delivery charges, and

21  (iv) that behavioral economics studies have corroborated Congress's condemnation of these

22  marked-up charges." Dkt. No. 67 at 8. Additionally, plaintiffs suggest that their claims are

23  different because they do not "allege that the destination charges are paid by dealerships": "[t]he

24  dealers are a mere intermediary, passing consumers' money on to FCA." *Id.* at 9-10 (citing Dkt.

25  No. 1 ¶¶ 30, 47, 93).

26  Taking these observations as true for present purposes only, they do not make a material

27  difference. To start, the complaint's disjointed, incomplete discussion of the 1950s debate over

28  phantom freight brings plaintiffs no closer to plausibly alleging that FCA's destination-charge

1   practices are fraudulent.  The complaint's foray into behavioral economics, *see* Dkt. No. 1 ¶¶ 40-

2   42, bears no clear relationship to FCA's alleged misconduct.  For example, the complaint

3   mentions "drip pricing," which "refers to purchases where consumers are first presented with an

4   element of the price upfront -- like a new vehicle's MSRP, which is mentioned universally in

5   vehicle marketing and advertising -- and then learn about compulsory price increments (like a

6   destination charge) later in the buying process."  *Id.* ¶ 40.  But the allegations in the complaint are

7   directed to FCA's disclosure of the destination charge on the Monroney label -- where the charge

8   appears in small font immediately above a box that contains the "TOTAL PRICE."  *Id.* ¶¶ 12, 18.

9   Contrary to plaintiffs' suggestion, the complaint does allege that dealers actually pay the

10  destination charges, even if the dynamics of the exchange between dealers and manufacturers

11  might have changed in some instances.  *See id.* ¶ 47 ("Whereas dealerships once paid cash upfront

12  for vehicles, it is now common for them to acquire vehicles on credit, paying FCA after selling the

13  vehicles.").  Plaintiffs do not adequately explain how this change in the dealer-manufacturer

14  financing arrangement is enough to render FCA's practices fraudulent to consumers.

15  **II.      CLRA AND OTHER CLAIMS**

16          Plaintiffs have not plausibly alleged that FCA's conduct was unfair, fraudulent, or

17  deceptive, nor that FCA is unlawfully or unjustly retaining money that belongs to them.

18  Consequently, plaintiffs' remaining claims -- which arise out of the same conduct that is the

19  subject of their UCL claim -- are dismissed.  *See McGinity*, 69 F.4th at 1097 (CLRA); *Berryman v.*

20  *Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1557, 1559-60 (2007) (unjust enrichment;

21  money had and received).

22                                    **CONCLUSION**

23          The complaint is dismissed in its entirety.  Plaintiffs will have an opportunity to amend.

24  *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).  Plaintiffs may file an amended

25  complaint that is consistent with this order by September 5, 2023.  The amended complaint may

26  not add any new claims or defendants without express prior approval from the Court.  Plaintiffs

27  are advised that further opportunities to amend are not likely to be granted.  A failure to meet the

28

United States District Court
Northern District of California

1    amendment deadline will result in a dismissal with prejudice under Federal Rule of Civil

2    Procedure 41(b).

3        **IT IS SO ORDERED.**

4    Dated:  August 22, 2023

JAMES DONATO
United States District Judge

11